**Opinion filed May 30, 2024**



In The

# Eleventh Court of Appeals

_____

## Nos. 11-22-00192-CR & 11-22-00194-CR

_____

## CARL EDWARD DUHAMEL, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 244th District Court**

**Ector County, Texas**

**Trial Court Cause Nos. C-20-0599-CR & C-20-0598-CR**

### M E M O R A N D U M   O P I N I O N

Appellant, Carl Edward Duhamel, was originally indicted in separate cause numbers for the offenses of injury to a child and continuous violence against the family. TEX. PENAL CODE ANN. §§ 22.04(a)(3), 25.11(a) (West Supp. 2023). He was later reindicted in each cause for the third-degree felony offense of assault family violence with a prior conviction. PENAL § 22.01(b)(2)(A).

These causes were consolidated for trial. At 1:30 p.m. on the Friday before the following Monday trial setting, Appellant filed a motion for a competency examination. On the morning of trial, the trial court conducted an informal inquiry into Appellant's competency to stand trial and, after doing so, denied Appellant's motion. Appellant subsequently entered pleas of guilty to both offenses, pleaded "true" to the first and second enhancement paragraphs, and pleaded "not true" to the last three enhancement paragraphs. The trial court found Appellant guilty of both charged offenses, found all five enhancement paragraphs to be "true," and sentenced Appellant to the following terms of imprisonment, to be served concurrently, in the Institutional Division of the Texas Department of Criminal Justice: (1) twenty-five years' imprisonment in trial court cause number C-20-0599-CR, and (2) forty-five years' imprisonment in trial court cause number C-20-0598-CR.

In his sole issue on appeal, Appellant contends that the trial court abused its discretion when it denied his motion for a competency evaluation.[1] We affirm.

## I. *Factual Background*

The facts underlying the offenses for which Appellant was convicted have no bearing on the issue that he raises on appeal. The following pretrial matters, however, are central to our analysis and the resolution of his complaint.

The record shows that the State presented a plea offer to Appellant of seven years' imprisonment for each offense in exchange for his pleas of guilty. At a

---

[1]In each appeal, Appellant's first court-appointed appellate counsel submitted an *Anders* brief and filed a motion to withdraw. *See Anders v. California*, 386 U.S. 738 (1967). Following the procedures set forth in *Anders*, *Kelly v. State*, 436 S.W.3d 313 (Tex. Crim. App. 2014), and *In re Schulman*, 252 S.W.3d 403 (Tex. Crim. App. 2008), we independently reviewed the record and concluded that these appeals were not particularly amenable to disposition under *Anders*. We granted counsel's motion to withdraw, abated these appeals, and remanded these causes to the trial court with instructions to appoint other appellate counsel. New appellate counsel was directed to file a brief on the merits in each appeal and address any substantive issues that appellate counsel deemed to be arguable. These appeals were reinstated after the trial court appointed new appellate counsel.

pretrial hearing on Appellant's motion for a bond reduction, Appellant's trial counsel at the time, Tony Chavez, stated that he had discussed the applicable punishment range with Appellant for each offense, if he was convicted and if the State's enhancement allegations were found to be "true"—twenty-five years' to ninety-nine years' imprisonment, or life imprisonment—and that, although Appellant understood the potential punishment range, he nevertheless chose to reject the State's plea offers and instead desired to proceed to trial. *See* PENAL § 12.42(d) (West 2019).

Shortly thereafter, Appellant became dissatisfied with Chavez's representation and Chavez filed a motion to withdraw as counsel; hearings were held on this motion on June 7 and June 10. As is discussed in detail below, at each of these hearings, Appellant expressed his dissatisfaction with Chavez's representation and alleged that Chavez had threatened him and his family.

Soon after these hearings, Appellant retained attorney Johanna Curry to represent him in these cases; she filed an appearance as counsel for him, and the trial court granted Chavez's motion to withdraw and Curry's motion to substitute as Appellant's trial counsel. Six days before his trial was set to commence, Appellant moved for a continuance on the grounds that his constitutional rights had been violated. In his motion, Appellant asserted that during Chavez's representation, Chavez would not visit Appellant while he was confined in the county jail awaiting trial but would send his non-attorney son in his stead. Appellant also asserted that he was never kept informed or "up-to-date" on the pending charges, and that although he was ready for trial on the original charges of continuous family violence and injury to a child he was never given an opportunity to consider or accept plea offers for the reindicted charges of assault family violence, which he claimed, if plea offers had been presented by the State, he would have accepted them.

The trial court held a hearing on Appellant's motion for continuance the following day. Appellant testified and articulated his understanding of the charges pending against him and the factual allegations upon which these charges were based. He stated that, initially, he was confused when he was reindicted, but he later spoke with Curry and she explained "exactly what [he was] charged with." Appellant contended he never had the opportunity to plead guilty to the reindicted charges and he indicated that this was the reason he urged Curry to seek a continuance.

During cross-examination, Appellant explained his understanding of the applicable punishment range for each offense, which was enhanced to habitual status because of his prior criminal history. Appellant acknowledged that the charges for which he was originally indicted were based upon the same events as the charges alleged in the reindictments. He conceded that he was fully aware that he had no right to, and the State was not required to present, any plea offers, and that any plea offers previously conveyed by the State had expired and been withdrawn. Appellant also expressed that he had been willing to proceed to trial on the original charge of continuous family violence because he believed one of the predicate incidents of family violence was based on weak facts that he could successfully impugn at trial, but he did not believe his odds of prevailing at trial were as great in light of the reindicted charges; therefore, he desired to negotiate a plea bargain with the State rather than to proceed to trial on the reindicted charges. After the hearing, the trial court denied Appellant's motion for continuance.

On the Friday before the Monday trial setting, Appellant filed a motion for a competency examination. In that motion, Curry stated that she was unable to effectively communicate with Appellant in a manner that would assist in his defense. Specifically, she stated: "[Appellant] has not been able to recount the circumstances

4

of the alleged offenses or otherwise aid in his own defense. [Appellant] seems unable to focus and unable to maintain a conversation because he switches randomly from one topic to another. My visits with him have been entirely unfruitful. . . . Though [Appellant] has been convicted of offenses previously, he appears unable to engage in a reasoned choice of legal strategies and options." Curry also stated that Appellant revealed to her that he had been on medications for schizophrenia and had been admitted to various mental institutions on several occasions.

In her affidavit that is attached to the motion, Curry stated that "[i]t is my professional belief that the defendant has neither sufficient present ability to consult with me with a reasonable degree of rational understanding, nor have I witnessed an appropriate appreciation of the factual understanding of the proceedings in which the defendant finds himself."

The trial court addressed the issue of Appellant's competency to stand trial the following Monday morning, the day that Appellant's trial was set to begin. The trial court began its informal, yet thorough, inquiry regarding Appellant's competency to stand trial. The trial court asked Appellant whether he understood that two charges of assault on a family member were pending against him. Appellant replied that he did. Appellant confirmed that he understood that the State bore the burden to prove every element of the charged offenses beyond a reasonable doubt. He also stated that he understood that he had the right to assist his trial counsel in making some decisions about which persons would serve as jurors.

Appellant stated that, although he believed he had a right to a plea offer, he was never offered one. He further stated that he did not want to go to trial and that he wished he "had never done what [he] done [sic]." Appellant told the trial court that he believed the State and Chavez had "weaseled" him out of a plea bargain. He stated that he was "[v]ery, very, very" "upset and dismayed" with the representation

5

provided to him by Chavez. Appellant explained that when he hired Curry, he informed her on the first day they met that he was "just looking for a decent plea bargain." Appellant further advised the trial court that he was dismayed because he was now "standing on trial, about to get 5,000 years of my life taken away for something that I did, I'm guilty. Yes sir, I am guilty of it. Yes sir, I'm guilty, never said I wasn't guilty of it."

Appellant continued to confirm that he understood his rights and what would occur at trial. He stated he understood that he had the right to observe and listen to all witnesses who testified and to confer with his trial counsel about their testimony. He understood that after the jury heard all of the evidence presented to them, it would receive instructions from the trial court, and it would hear arguments from trial counsel. He understood that the jury would then deliberate on his guilt or innocence, and, if the jury convicted him, the trial would then proceed to the punishment phase.

At this juncture, the trial court inquired as to whether Appellant had discussed his punishment election with Curry. Appellant initially stated that he would leave that decision to Curry, but then he asked: "Which one would choose the lighter sentence?" Curry then clarified that she had filed a punishment election the day before. Appellant confirmed that he understood that an election of punishment had been filed and confirmed that he had discussed this decision previously with Curry. Appellant also stated that he understood his Fifth Amendment right to testify or not testify, and that choosing to testify would subject him to cross-examination by the State.

After this, Appellant adduced evidence that he had previously suffered from a mental illness and that Chavez and Curry had difficulty communicating with him about his case. Appellant also made several severe comments and allegations regarding Chavez.

Appellant testified that he suffered from schizophrenia and that he had been admitted to several regional mental hospitals ("Oceans" and "River Crest") on multiple occasions for treatment. He stated that he was not receiving medications while he was confined in the Ector County Law Enforcement Center (ECLEC). When asked if he had been subject to an evaluation during his confinement in the ECLEC, Appellant replied:

> No, they just put me in the padded room. That was their way of evaluation . . . stripped me naked and made me almost freeze to death and vomit. And kept me in there for hours at a time, hours, hours, a long time. How do you keep somebody in a padded room with no clothes for ten hours. I'd love to stress that, that will help somebody, that will mentally break you, that will tell you I'm sorry, I will never do it again.

Later, when he was again asked if he knew how long it had been since he had taken any medications, Appellant replied:

> [T]he last time I was in Oceans -- I mean River Crest. It's been a while. I was -- it's fine, it's the meth that does that . . . as long as I stay off the meth, it will be all right. It's the meth. Once I get back on the drugs, then all that stuff comes -- becomes -- it starts to come back. If that's what -- it's just the drugs.

He then explained that he had been confined for the past five months with no access to methamphetamine, and he agreed that he was "thinking clearly now." Appellant further stated that "[d]rugs causes [sic] a lot of those problems. Drugs cause a lot of my problems."

Despite Appellant's claim of mental illness, he did not offer any documentation to establish (1) his apparent diagnosis of schizophrenia, (2) his admissions into the mental hospitals he had mentioned, or (3) any of the medications he had supposedly been prescribed.

During the trial court's informal inquiry, Curry asked Appellant: "Did you ever in [our] conversations offer me any insight into your mindset or anything about what occurred around [one of the incidents alleged in his reindictment]?" Appellant responded: "I don't really know. We talked about a lot of things. I don't think I said anything because I didn't think it was going to go this far. But I know we talked about a lot of things, but I don't know. I don't think we talked about the [incident]." Curry then asked him whether he often did not remember things, to which Appellant replied: "I have an extensive use of drug use."

Although Appellant testified to the matters outlined above, the majority of Appellant's testimony at the informal inquiry hearing focused on and concerned his displeasure with Chavez. Thus, some background context preceding the informal inquiry is helpful here.

As previously mentioned, the trial court held two hearings to consider Chavez's motion to withdraw as counsel; at each hearing, Appellant complained extensively about Chavez's representation and alleged that Chavez had threatened him and his family. Specifically at the first hearing, Appellant claimed that: Chavez "never came out to see me, doesn't know anything about me. . . . Threatened to have me tied up in Mexico and eaten by rats if I don't pay him his money." Appellant also alleged that someone from Chavez's law firm told him "I thought you were just a crackhead trying to get out of jail." Appellant explained that those were the reasons he did not want Chavez or his firm representing him. For his part, Chavez denied threatening Appellant or his family and stated that he had told Appellant the following:

> If I make your bonds and you think you're going to be cute and you're going to take off and not show up, I'll find you. I will find you and if you go to Mexico, it'll be easier to find you. That had nothing to do with representing him. I was just telling him that if I make your bonds,

I expect you to show up or there are going to be consequences and they're not going to be pleasant for you.

At this, Appellant retorted: "Threatening my family is a consequence, instead of saying going to jail?" To which Chavez replied: "That wasn't at all what I said. And I wasn't talking about his family."

At the second hearing on the motion to withdraw, Chavez strenuously argued that he should be permitted to withdraw because Appellant had informed him that he had been fired. The trial court reiterated that he would only grant the motion if Appellant retained another attorney, because Appellant's trial was set to begin in two weeks. Appellant explained at length how he thought Chavez's law firm was misleading him and obstructing his endeavors to hire an attorney to replace Chavez.

Chavez professed that he wanted to refund the retainer that Appellant had paid him or transfer it to whoever Appellant hired to replace him; he also expressed his displeasure that the trial court was refusing to allow him to immediately withdraw. Chavez declared that, if the trial court forced him to continue with his representation of Appellant and if Appellant failed to retain replacement counsel before the trial date, he would inform the jury: "I was fired, I'm here because the judge says that I have to be here, you guys do whatever you want." The trial court then reminded Chavez of his oath to represent his client zealously, and Appellant interjected: "I don't want somebody like that representing me, Your Honor." The trial court later granted Chavez's motion to withdraw and Curry's motion to substitute counsel.

At the informal inquiry hearing, Appellant made several extreme comments and allegations regarding Chavez, which are best informed by the background context outlined above. There, the following exchange occurred between Appellant and Curry:

> [CURRY]: Did you tell me that you were being threatened, your life was being threatened . . . [?]

9

[APPELLANT]: Everybody is threatening my life. Everybody is threatening my life. You have an attorney that says he is going to have you tied up in Mexico and eaten by rats, and the judge didn't do nothing. Everybody is threatening my life. That is -- that is a threat. And he sabotaged the case, he sabotaged me, he sabotaged me. He told me, he said, you F-ing with the wrong one, and obviously I was, obviously I was.

[CURRY]: Did he say that to you in the courtroom on the record?

[APPELLANT]: No, he said -- what he said in the courtroom on the record was that he was going to sabotage the case in front of the jury, and tell the jury that and let them do what they want. And Mr. -- Your Honor said, you will not do that, [Chavez]. He said, I'll just let the jury -- I won't prepare no defense and let the jury do what they want to do with him, and I don't care. And obviously, that's why you have no information on my case.

[CURRY]: Because you're distrustful of attorneys?

[APPELLANT]: Everything, and he -- I trusted him with my life, and look what he did with the plea and the case, and everything, like everything. He didn't sit me down one time and say, [Appellant], this is the last plea offer, this is -- anything, this is what's going on. He just said I -- get out of here and get out of my face, you're a lying piece of s--t and all. That's why I chose to fire him. And I told the judge that. I said, Your Honor, the reason why is because he threatened my life, he said these things about me, he called me a crackhead. And all these -- how are you calling me a crackhead and you're my attorney? You're just a crackhead. That's where we went wrong at. That's where the case went wrong at.

Later during this hearing, Appellant and Curry discussed Chavez again. Curry asked: "Do you feel like people are out to get you?" Appellant reiterated his dissatisfaction with Chavez's representation and again claimed, in a lengthy diatribe, that Chavez had threatened him and his family, and had also lied to the trial court and refused to refund the retainer that Appellant had paid him. Curry inquired if Appellant's negative relationship with Chavez was the reason why he had not

10

engaged her or discussed his case with her. Appellant replied that he did not know who to trust, that everyone in the courtroom were friends, but that no one was his friend. He qualified that Curry had performed wonderfully: "[N]o matter how many times I jumped up and stormed out of that room and slammed the door, you always kept it professional, and I thank you for that."

Appellant then returned to the subject of Chavez by inquiring whether there were charges that he could file against him. Appellant stated that he had already filed grievances against Chavez with the State Bar of Texas.

At the conclusion of the informal inquiry, the trial court denied Appellant's motion for a formal competency evaluation and Appellant's cases proceeded to trial. The trial court stated that it had reviewed all of the evidence presented—including Appellant's testimony at the hearing on his motion for continuance and his statements and testimony during the informal inquiry—and had considered the factors set forth in Article 46B.024 of the Texas Code of Criminal Procedure, and, with respect to each factor, it found that the evidence did *not* suggest that Appellant lacked the capacity to rationally understand the charges against him or the potential consequences of the resolution of the pending criminal proceedings. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.024 (West 2018). The trial court noted that Appellant "has certainly expressed his disgust and dismay and even anger as to his prior representation by [Chavez]" and that Appellant had referred that matter to the State Bar of Texas. The trial court further concluded that there was an absence of some evidence to suggest that Appellant currently suffered from a mental illness, or that any lack of medication provided to him while he was confined at the ECLEC awaiting trial had caused him to be incapable of rationally consulting with his trial counsel or rationally and factually understanding the proceedings pending against him.

## II. *Standard of Review and Applicable Law*

A defendant's due process rights are violated when he is tried and convicted while he is mentally incompetent to stand trial. *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Boyett v. State*, 545 S.W.3d 556, 563 (Tex. Crim. App. 2018); *Turner v. State*, 422 S.W.3d 676, 688–89 (Tex. Crim. App. 2013). Generally, a defendant is presumed to be competent to stand trial unless proven otherwise by a preponderance of the evidence. CRIM. PROC. art. 46B.003(b). If, however, a defendant does not have (1) "sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding," or (2) "a rational as well as factual understanding of the proceedings against [him]," he is considered to be incompetent to stand trial. *Id.* art. 46B.003(a).

A trial court must employ a two-step process in making competency determinations before it may ultimately conclude that a defendant is incompetent to stand trial. *Boyett*, 545 S.W.3d at 563. The first step is an informal inquiry; the second step is a formal competency trial. *Id.* An informal inquiry is required when a "suggestion" is presented from any credible source that the defendant may be incompetent to stand trial. *Id.* (citing CRIM. PROC. art. 46B.004(a), (c), (c-1)). During the informal inquiry, there must be "some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." CRIM. PROC. art. 46B.004(c); *Boyett*, 545 S.W.3d at 563. The Court of Criminal Appeals has described this standard as requiring "more than none or a scintilla" of evidence that "rationally may lead to a conclusion of incompetency." *Boyett*, 545 S.W.3d at 563–64 (citing *Turner*, 422 S.W.3d at 692). If the trial court determines at the informal inquiry stage that "some evidence" of incompetency exists, it must then order that the defendant submit to a psychological or psychiatric examination and, except for certain exceptions, later proceed to a formal competency trial. *Id.* (citing

CRIM. PROC. arts. 46B.005(a), (b), 46B.021(b)). At the informal inquiry stage, "the standard for requiring a formal competency trial is not a particularly onerous one." *Id.* at 564.

The trial court is not required to follow any specific protocols in conducting the informal inquiry. *George v. State*, 446 S.W.3d 490, 501 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). During the informal inquiry, the trial court "must consider only evidence of incompetency, and it must not weigh evidence of competency against evidence of incompetency." *Boyett*, 545 S.W.3d at 564. Thus, in making this initial determination, "[the] trial court must consider only [the] evidence [that tends] to show incompetency" and disregard "all competing indications of competency." *Id.* (quoting *Turner*, 422 S.W.3d at 692). "[S]ome evidence must be presented at the informal inquiry stage to show that a defendant's mental illness is the source of his inability to participate in his own defense." *Id.* Thus, there must be "some evidence from which it may rationally be inferred *not only* (1) that the defendant suffers from some degree of [a] debilitating mental illness, and that (2) he obstinately refuses to cooperate with counsel to his own apparent detriment, *but also* that (3) his mental illness is what fuels his obstinacy." *Id.* (quoting *Turner*, 422 S.W.3d at 696). It is not enough to present evidence of a defendant's mental illness alone or his refusal to cooperate with trial counsel— rather, there must be "some evidence" that indicates that the defendant's mental illness is the reason why he refused to rationally engage with his trial counsel. *Id.*

Because the trial court can observe the defendant's mannerisms and behaviors, it is in a better position to determine whether a defendant is competent to stand trial. *McDaniel v. State*, 98 S.W.3d 704, 713 (Tex. Crim. App. 2003) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We therefore review challenges to the adequacy of the trial court's informal competency inquiry, its

findings and determinations following its informal inquiry, and its decision whether to order a formal competency examination, for an abuse of discretion. *George*, 446 S.W.3d at 499 (citing *Luna v. State*, 268 S.W.3d 594, 600 (Tex. Crim. App. 2008)); *Goswick v. State*, No. 11-16-00164-CR, 2017 WL 2986841, at *2 (Tex. App.—Eastland July 13, 2017, no pet.) (mem. op., not designated for publication). We do not substitute our judgment for that of the trial court; instead, we determine whether the trial court's decision was unreasonable. *Goswick*, 2017 WL 2986841, at *2. A trial court does not abuse its discretion absent a showing that its decision was arbitrary or unreasonable and we must afford great deference to a trial court's factual findings of a defendant's ability to understand the nature of the proceedings pending against him and to assist trial counsel in his defense. *McDaniel*, 98 S.W.3d at 713.

### III. *Analysis*

In his sole issue, Appellant contends that the trial court abused its discretion when it denied his motion for a competency evaluation. Based on this record, we conclude that Appellant failed to present some evidence, at the informal inquiry stage, that would support a rational finding of fact that he was incompetent to stand trial. Therefore, the trial court properly denied Appellant's motion for a formal competency examination.

As evidence of his alleged incompetency, Appellant presented Curry's statement in her affidavit that, in her belief, Appellant did not have the sufficient present ability to consult with her with a reasonable degree of rational understanding, nor did she observe in Appellant an appropriate appreciation of the factual understanding of the pending proceedings. Appellant stated that he had previously been diagnosed with schizophrenia and treated in various mental hospitals on several occasions. He stated that Chavez had threatened him and prevented him from obtaining a "decent" plea offer from the State. He also stated that he did not want

to go to trial and that he wanted a plea bargain because he was "about to get 5,000 years of [his] life taken away." Appellant avers that "[t]here was nothing from the State at the inquiry [stage] to rebut any of the statements made by Appellant."

But, and importantly, none of the evidence presented to the trial court indicated that Appellant's apparent history of mental illness caused him to refuse to rationally engage with counsel or "fuel[ed] his obstinacy." *See Boyett*, 545 S.W.3d at 564 (quoting *Turner*, 422 S.W.3d at 696). To be sure, there was some evidence presented that, according to Appellant, he previously suffered from a mental illness—he stated that he had previously been diagnosed with schizophrenia, that he previously took medications for this condition, and that he had previously been admitted to mental hospitals for treatment multiple times. Further, Curry informed the trial court of the difficulty she experienced communicating with Appellant regarding trial strategy. Irrespective of this proffer, there must also be some evidence that Appellant's mental illness was the cause of his inability to participate in his own defense. *Boyett*, 545 S.W.3d at 563–64.

Applying this standard, the Sixth Court of Appeals held that the trial court did not abuse its discretion when it determined, after its informal inquiry, that the defendant was competent to stand trial. *See Clark v. State*, 592 S.W.3d 919, 928 (Tex. App.—Texarkana 2019, pet. ref'd). The court held that the defendant fell short of establishing the third requirement of the "some evidence" standard articulated in *Boyett*—that there must be some evidence that supports a finding that "the defendant's 'mental illness is what fuels his obstina[te]' 'refusal to cooperate with his counsel to his own apparent detriment.'" *Id.* at 928 (quoting *Boyett*, 545 S.W.3d at 563). The court also noted that the defendant testified that he had a college education and was aware of the charges against him, as well as the roles of the prosecutor, his attorney, and the trial court during the criminal proceeding. *Id.* at

929 n.10. The court emphasized that it did not recite these facts to weigh evidence of competency against incompetency, but only to highlight the lack of some evidence of incompetency. *Id.* The same reasoning applies here.

In this case, Appellant points to his statements regarding Chavez—that Chavez threatened him by telling him he would be tied up and eaten by rats in Mexico—and his statements that he was facing a sentence of a thousand or five thousand years as some evidence that his apparent mental illness prevented him from engaging with his trial counsel. However, the context of the pretrial proceedings recited above situates Appellant's statements about Chavez in a different light. In response to Appellant's allegation, Chavez admitted that he made some statements to Appellant involving "Mexico" and certain "consequences," though he denied the specific context in which Appellant claimed he had been threatened by Chavez. Throughout the subsequent proceedings, Appellant consistently referred to Chavez and his version of this specific interaction, and other complaints about him, which seemed to be his primary focus, even as he repeatedly confirmed to the trial court— through his words as well as his actions—that he understood the charges pending against him, the rights available to him, and the proceedings as they were unfolding. A defendant's level of competency at one proceeding is not dispositive of his competency at a later proceeding, but this context sheds a different light on the statements that Appellant made at the informal inquiry.

The trial court conducted a multitude of pre-trial proceedings in the weeks and days leading up to the morning of Appellant's trial, when it conducted its thorough, informal inquiry into Appellant's competency to stand trial. At each proceeding, the trial court observed Appellant's repeated dissatisfaction with Chavez, even including after Chavez had withdrawn from the case and been replaced by Curry. Thus, the trial court was intimately familiar with Appellant's disdain for Chavez. Under these

circumstances, these were not new or outlandish assertions from Appellant. Rather, it was his repeated complaints regarding his specific interactions with Chavez, to which Chavez did not entirely deny.

In addition to this,[2] the trial court thoroughly examined Appellant during the informal inquiry regarding his understanding of the pending charges and court proceedings, and of his rights regarding them, both during the hearing on Appellant's motion for continuance—five days before trial was to commence—and during the informal inquiry on the morning of trial. At each juncture, Appellant confirmed that he understood his rights, the charges pending against him, and the nature of the court proceedings. He further displayed his understanding of these particulars through (1) Curry's substitution of counsel (and his repeated stated dismay about Chavez's representation, including during the informal inquiry), (2) his stated change of a desired trial strategy upon his reindictment on different charges, (3) his commentary as to his punishment election, (4) his expression of remorse, and admissions, regarding his charged conduct, and (5) his explanation during the inquiry to Curry that he did not engage with her because he "didn't think it was going to go this far."

The trial court is able to observe the defendant's mannerisms and behaviors, and therefore is in the best position to evaluate the evidence, the defendant, and ultimately determine whether a defendant is competent to stand trial. *McDaniel*, 98 S.W.3d at 713 (citing *Guzman*, 955 S.W.2d at 89). We defer to the trial court's

---

[2]We emphasize, as did our sister court in *Clark*, that we do not recite these additional facts to weigh evidence of competency against evidence of incompetency, but only to highlight the lack of "some evidence" of incompetency. *See Clark*, 592 S.W.3d at 929 n.10 (citing *Boyett*, 545 S.W.3d at 564). There is some evidence that Appellant may suffer from a mental illness. There is some evidence that he may have "obstinately refuse[d] to cooperate with counsel to his own apparent detriment" at some points during the representation. *Boyett*, 545 S.W.3d at 564. But here there is an absence of "some evidence" in the record that "his mental illness is what fuels his obstinacy." *Id.* (quoting *Turner*, 422 S.W.3d at 696). Whatever evidence exists regarding his "obstinacy," it is not tantamount to "some evidence" that indicates that his purported mental illness caused him to refuse to rationally engage with his trial counsel. CRIM. PROC. art. 46B.005(a); *see Clark*, 592 S.W.3d at 928–29 & n.8.

findings, as we must. *McDaniel*, 98 S.W.3d at 713. Under these facts and based on the record before us, we conclude that the trial court's decision not to order a formal competency examination was not unreasonable. *See Goswick*, 2017 WL 2986841, at *2. As such, the trial court did not abuse its discretion when it denied Appellant's motion for a competency evaluation.

Accordingly, we overrule Appellant's sole issue.

## IV. *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE


May 30, 2024

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.